FILED
2017 Jul-03  PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |
|---|---|
| TOMMY & KATRINA HEARD, | **Civil Action No. 2:16-CV-00694-MHH** |
| Plaintiffs, | |
| v. | PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| NATIONSTAR MORTGAGE LLC, *et al.* | Hearing Date: TBD |
| Defendants. | Time TBD |
|  | (Oral Argument Requested) |

## TO ALL PARTIES AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 56 Plaintiffs, Tommy and Katrina Heard ("Plaintiffs"), hereby submit their motion for partial summary judgment against Defendant, Nationstar Mortgage, LLC ("Nationstar").

Plaintiff's motion will be based on this Notice of Motion, the attached Memorandum of Points and Authorities, the attached Statement of Facts with exhibits, the pleadings and papers on the file herein, and such further argument and evidence as may be presented.

DATED this 3rd day of July 2017.

/s/ David A. Chami
David A. Chami (pro hac vice)
PRICE LAW GROUP, APC
1204 E. Baseline Road, Suite 102
Tempe, Arizona 85283
david@pricelawgroup.com

/s/Joshua C. Snable
SNABLE LAW FIRM, LLC
2112 11th Avenue South, Suite 528
Birmingham, AL 32505
jsnable@snablelaw.com
Attorneys for Plaintiffs
Tommy & Katrina Heard

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION………………………………………….…………… 1

II.     LEGAL STANDARD……………………………………….……….... 2

III.    STATEMENT OF FACTS…………….……………………….…….... 2

IV.     ARGUMENT………………………….…………………….………... 5

    A.     Defendant Violated The
       TCPA……………………….……………………………… 6

      1. Defendant did not have consent to contact
         Plaintiffs………………………………………………….….... 7
      2. Defendant used an ATDS when contacting
         Plaintiffs……………………………………….…………….… 8
      3. Defendant willfully and knowingly violated
         TCPA………………………….................................…………… 13
      4. Defendant's use of pre-recorded messages is a per se violation of the
         TCPA……………………………………………………………..15

    B.     Defendant Violated The
       FCRA…………………………………..…………………… 16

V.      CONCLUSION……………………………………………… 23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alea London Ltd. v. American Home Services, Inc.,*
    638 F.3d 768, 776 (C.A.11 (Ga.),2011)……………………………….. 14

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242, 255(1986)……………………..…………….....………... 2

Celotex Corp. v. Catrett,
    477 U.S. 317, 323 (1986)………...……………………………………… 2

*Gager v. Dell Financial Services LLC,*
    727 F.3d 265 (3d Cir. 2013)………………….…………………………….. 7

*Harris v. World Financial Network Nat. Bank,*
    867 F.Supp.2d 888, 895 (E.D.Mich.,2012)……………………………….. 14

*Hinkle v. Midland Credit Management, Inc.,*
    827 F.3d 1295, 1302 (C.A.11 (Ga.), 2016)……………………….. 17, 18, 19

Lawrence v. Bayview Loan Servicing, LLC,
    666 Fed.Appx. 875, 879 (C.A.11 (Fla.), 2016)……………………………. 7

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574, 586 (1986)……………….…………………………………..2

*Osorio v. State Farm Bank,*
    746 F.3d 1242 (11th Cir. 2014)……………….…………………………… 7

*Strauss v. CBE Group, Inc*.,
    173 F.Supp. 3d 1302, 1310 (S.D. Fla., 2016)……………….……..……… 10

## FCC DECLARATORY RULINGS

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* (2015 FCC Ruling),

30 FCC Rcd. 7961, 7990……………………...……………..…………. 7

*In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991,*
2003 WL 21517853, 18 F.C.C.R. 14014 ¶ 131 (July 3, 2003)…………...… 9

*In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991,*
2008 WL 65485, 23 F.C.C.R. 559 ¶ 12 (Jan. 4, 2008)………………...…… 9

**STATUTES**

47 U.S.C. § 227……………………………………..……1, 7, 9, 13, 15, 16, 23

15 U.S.C. Sections
§ 1681s-2(b)……………………………………………………… 17, 18, 23
§ 1681s-2(b)(1)(A) ……………………………………...………………..18

**RULES**

Fed. R. Civ. P. 56(c)…………………………………………………… 2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This matter concerns the unlawful actions of Defendant Nationstar LLC ("Defendant") in violation of the Telephone Consumer Protections Act, 47 U.S.C. § 227 *et seq.* ("TCPA") and the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"). Defendant Nationstar is a "furnisher" of information to consumer reporting agencies under FCRA § 1681s-2. Plaintiffs' Complaint (Doc. 1) alleges Defendant Nationstar made non-emergency calls without consent using an automatic telephone dialing system to Plaintiffs' cell phone, failed to conduct a reasonable investigation of the credit information it was reporting with respect to Plaintiffs, thereby violating its duties as a furnisher under the FCRA. As a result of Defendants actions, Plaintiffs have suffered actual pecuniary losses related to time and expenses in preparing and mailing certified letters to the Defendants, have suffered multiple credit denials, received credit at higher interest rates, have suffered emotional distress, anxiety, sleepless nights and humiliation related to the inaccurate credit reporting.   Furthermore, Plaintiffs have suffered emotional distress, stress and anxiety related to the constant barrage of phone calls and past due billing statement they receive each month.   Plaintiff Tommy Heard further suffered longer work days due to multiple interruptions by Defendant calling Plaintiff while he was at work despite having instructed Defendant that the calls were interrupting him at work.   For

the reasons discussed herein, Plaintiffs respectfully request that the Court grant Plaintiffs Tommy & Katrina Heards' Motion for Summary Judgment in respect to its claims made against the Defendant.

## II.   LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that establish the absence of a material issue of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Plaintiff believes that the undisputed facts warrant summary judgment for Plaintiff on all claims.  The only issue for trial would be related to damages.

## III.   STATEMENT OF FACTS

In or around 2001, Plaintiffs, Tommy and Katrina Heard, entered into a conventional mortgage loan with AMSouth Bank to purchase a new home. Plaintiffs' Statement of Facts ("PSOF"), ¶ 1. The property was an investment home

located at 1002 Ladiga Southeast Street, Jacksonville, AL 36265 (the "Property") and not Plaintiffs' residence. PSOF at ¶ 3. In or around 2004, the Plaintiffs refinanced their mortgage with GMAC Mortgage. *Id.* at ¶ 2. Subsequently, in or around 2012, GMAC Mortgage filed for bankruptcy protection and the mortgage servicing for the Property was transferred to Ocwen. *Id.* at ¶ 4. Plaintiffs have always made timely payments on the mortgage. *Id.* at ¶ 5. Since the inception of the loan, Plaintiffs have maintained adequate property insurance and paid insurance and taxes separately. *Id.* at ¶ 6. Further, Plaintiffs went so far as to setup automatic online payment so that their payment would always be on time. *Id.* at ¶ 7.

On or about June 4, 2015 Plaintiff Tommy received a collection call from Defendant. *Id.* at ¶ 15. Defendant claimed that the mortgage payment for the month of May was past due in the amount of $503.85. *Id.* at ¶ 11. About half way through the call Plaintiff realized, for the first time, that Defendant was now also servicing the loan for the Property in addition to the loan on another property he owned. *Id.* at 16. Plaintiff explained to the collector that the Property was insured and was not escrowed for taxes and insurance. *Id.* at ¶ 18. Following the June 4, 2015 call, Plaintiff, through their insurance agent, faxed proof of insurance to Defendant on June 5, 2015. *Id.* at ¶ 21.

On July 28, 2015 Plaintiff answered another collection call from Defendant. PSOF ¶ 37. The representative stated that Nationstar had not received a payment for

the month of July even though the payment had been taken from the Plaintiff's bank account on July 10, 2015. *Id.* at ¶ 40. Again, on August 4, 2015, Plaintiff was forced to discuss the alleged delinquencies with Defendant. *Id.* at ¶ 44. The representative asked the Plaintiff to verify his information and informed Plaintiff that due to the use of automatic dialer he would not know what number he was calling. *Id.* at ¶ 49. After several failed attempts to remedy the situation, the Mr. Heard unequivocally revoked consent to be contacted on his cellular phone on August 22, 2015. *Id.* at ¶ 55.

Plaintiffs' revocation on August 22, 2015 was ignored and Defendant continued to contact Plaintiffs on their cell phone. Moreover, the Plaintiffs' unequivocally revoked another 14 times; on October 29, 2015, on November 9, 2015, November 23, 2015, on December 2, 2015, **twice** on December 3, 2015, on December 21, 2015, on December 22, 2015, on January 6, 2016, on January 15, 2016, on January 19, 2016, on February 9, 2016, on February 26, 2016, and on March 28, 2016. *Id.* at ¶ 58. Between August 22, 2015, and June 3, 2016, Plaintiffs were called using a predictive dialer, blast call or pre-recorded message 180 times after Plaintiffs unequivocally revoked consent to be contacted **numerous** times. *Id.* at ¶ 61.

In or around October 2015, Mr. Heard obtained a copy of his credit report and confirmed that Nationstar, despite its promise to correct any derogatory credit

reporting, had in fact reported him as delinquent in multiple months with the various credit reporting agencies. *Id.* at ¶¶ 54, 72.  Mr. Heard sent a dispute letter to the 3 major credit reporting agencies explaining why the information reporting was inaccurate and attached proof that his home was in fact insured without escrow *Id.* at ¶ 75.  As a result of the inaccurate reporting, Mr. Heard had multiple credit denials. *Id.* at ¶ 77.

Plaintiff Katrina Heard obtained a copy of her credit report in or around November 2015 and confirmed that Nationstar had also reported her as delinquent in different months with the various credit reporting agencies. *Id.* at ¶ 78. Mrs. Heard, like her husband, sent in similar dispute letters to the credit reporting agencies. *Id.* at ¶ 81. After receiving the disputes for both Plaintiffs, Defendant failed to remove the late payments and continued to report the Plaintiffs as delinquent in subsequent months.  ¶¶ 83, 84, 105-108.

## IV.   ARGUMENT

The TCPA was created to regulate the use of automatic telephone dialing systems, as well as pre-recorded and artificial voice calls. The FCRA was created to promote the accuracy and fairness of information in the files of consumer reporting agencies and those entities that furnish such information to the credit reporting agencies.

Congress made the following findings related to the FCRA:

1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

2) …

3) …

4) There is a need to insure that consumer reporting agencies exercise their **grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy**. (emphasis added)

15. U.S.C. § 1681.

The evidence and undisputed facts clearly illustrate that the Defendant violated both the TCPA and FCRA such that no reasonable jury could rule in favor of Defendant. Defendant admitted it erroneously reported Plaintiffs as late and charged for escrow without any substantiated evidence that Plaintiffs owed escrow on the account. PSOF at ¶¶ 85, 86. Defendant admitted that it utilizes an automated dialing system. *Id.* at ¶¶ 49, 52. The evidence shows that there was no human intervention needed to place the calls made to Plaintiff and that the system automatically predicted when the calls would be made to Plaintiff. *Id.* at ¶¶ 65, 68-70. There is no dispute Defendant made calls that were per se violations of the TCPA which prohibits pre-recorded calls without consent. *Id.* at ¶¶ 61-63. There is further no dispute that Defendant did not have Plaintiff's consent to call him at all, much less on his cell phone utilizing an ATDS. *Id.* at ¶¶ 57-58, 61.

The undisputed facts will clearly establish that Defendant failed to conduct a reasonable investigation (or any investigation) of Plaintiffs' disputes. It was only

after Plaintiffs initiated the present action (seven month after) before Defendant corrected the reporting errors. For the reasons stated above and the arguments outlined below, this Court should grant Plaintiffs' motion for partial summary judgment on all counts and the only remaining action remaining for trial should be related to damages.

### A. NO GENUINE DISPUTE OF MATERIAL FACT REGARDING WHETHER DEFENDANT VIOLATED THE TCPA; ACCORDINGLY, PLAINTIFF RESPECTFULLY REQUESTS THE ENTRY OF SUMMARY JUDGMENT AS TO LIABILITY PURSUANT TO 47 U.S.C. § 227(B)(3)(B).

#### (1) Defendant Violated the TCPA by contacting Plaintiff without consent

The Plaintiffs are entitled to summary judgment because the Defendant violated the TCPA by contacting Plaintiff without express consent. It is undisputed that Plaintiff unequivocally revoked consent to be contacted not less than 14 separate occasions, and the Defendant ignored those revocations and continued to contact Plaintiff. PSOF ¶ 58.

"No specific method is required under the TCPA for a caller to obtain prior consent to place automated calls or to subsequently revoke that consent." Lawrence v. Bayview Loan Servicing, LLC, 666 Fed.Appx. 875, 879 (C.A.11 (Fla.), 2016) (citing In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (2015 FCC Ruling), 30 FCC Rcd. 7961, 7990.) Thus, consistent with common law principles, oral revocation is

sufficient to withdraw prior express consent. *Id.*; *see also* 2015 FCC Ruling, 30 FCC Rcd. at 7965 (noting that "[c]onsumers may revoke consent at any time and through any reasonable means"). *Lawrence,* 666 Fed. Appx. at 879.  In 2014, the 11th Circuit, aligning itself with the 3rd Circuit, held that oral revocation of prior express consent to be contacted using in ATDS is sufficient to revoke that prior express consent. *Osorio v. State Farm Bank,* 746 F.3d at 1255 citing *Gager v. Dell Financial Services LLC* 727 F.3d at 273-74. Therefore, based on the overwhelming and incontrovertible evidence, Defendant did not have consent to contact Plaintiff using an ATDS.

Between August 22, 2015 and June 3, 2016, Mr. Heard was called using a predictive dialer where a live person would be connected to Mr. Heard after he answered the call or by prerecorded message/blast call where an automated message would be left for Mr. Heard 180 times after Plaintiff unequivocally revoked consent to be contacted beginning on August 22 and multiple times thereafter. PSOF ¶¶ at 55, 61. On August 22, 2015, Plaintiff received a phone call from Defendant. During this phone call, Plaintiff unequivocally revoked consent to be contacted on his cell phone. *Id.*  The Plaintiff continued to receive calls after he revoked consent to be contacted on fourteen additional occasion; October 29, 2015, November 9, 2015, November 23, 2015, December 2, 2015, **twice** on December 3, 2015, December 21, 2015, December 22, 2015, January 6, 2016, January 15, 2016, January 19, 2016, February 9, 2016, February 26, 2016, and March 28, 2016. *Id.* ¶ 58. Plaintiff's

revocations are written within the Defendant's own collection call notes and therefore cannot claim that their calls were not made without consent.  Furthermore, the sheer volume of the revocations and the number of calls that followed makes it clear that Nationstar willfully ignored Plaintiff's requests. *Id.*

### (2) Defendant Violated the TCPA by using an ATDS when Defendant called Plaintiffs

The Plaintiffs are entitled to summary judgment because the Defendant called Plaintiff's cell phone using a predictive dialer, blast call or pre-recorded message on an almost daily basis after Plaintiff Tommy Heard revoked consent to be called. PSOF ¶¶ 58, 61, 63.

Under the statute, the TCPA makes clear that "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States— (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call . . . ." 47 U.S.C. § 227(b)(1)(A)(iii). Furthermore, in its 2003 Order, the Federal Communications Commission ("FCC") explained that the TCPA includes equipment that "has the capacity to store or produce numbers and dial those numbers at random, sequential

order, or **from a database of numbers**" (emphasis added). *In the Matter of Rules &*
*Regulations Implementing the Telephone Consumer Protection Act of 1991*, 2003
WL 21517853, 18 F.C.C.R. 14014 ¶ 131 (July 3, 2003.) The FCC further explained
that the basic function of an ATDS equipment is "the capacity to dial numbers
without human intervention." Id. ¶ 132. In 2008 the FCC reaffirmed this definition
of an ATDS and stated that a **predictive dialer** is subject to the TCPA statute. *In the*
*Matter of Rules & Regulations Implementing the Telephone Consumer Protection*
*Act of 1991*, 2008 WL 65485, 23 F.C.C.R. 559 ¶ 12 (Jan. 4, 2008). The FCC
determined that "based on the statutory definition of 'automatic telephone dialing
system,' the TCPA's legislative history, and current industry practice and
technology, a predictive dialer falls within the meaning and definition of autodialer
and the intent of congress." *Id.* at 566. Moreover, "[t]he record demonstrates that a
predictive dialer is equipment that dials numbers and, when certain computer
software is attached, also assists telemarketers in predicting when a sales agent will
be available to take calls." 18 F.C.C. Rcd. 14014, 14091 (2003).

   In *Strauss v. CBE Group, Inc.*, the plaintiff was denied his motion for
summary judgment in part related to his TCPA claim because the plaintiff failed to
show that the defendant was using an automatic telephone dialing system. *Strauss v.*
*CBE Group, Inc.*, 173 F.Supp. 3d 1302, 1310 (S.D. Fla., 2016). The *Strauss* court
found that the dialing system used was not a predictive dialer because there was

substantial evidence "that human intervention is essential at the **point and time** that the number is dialed." *Id.* at 1311 (emphasis added). Also, the system and software utilized by the defendant required is not capable of initiating automatic outbound calls. *Id.* at 1310.

Unlike the defendant in *Strauss*, the Defendant in this case uses a system that is admittedly capable and in fact does make the outbound calls for the collector. PSOF ¶ 68. In addition, the system and software operated by Defendant requires no human intervention needed to place calls. *Id.* ¶ 70. These facts highlight significant differences with the facts that prevented summary judgment for the plaintiff in *Strauss*.

Nationstar further admitted that the iAssist program, which it uses to initiate the calls, predicts the best time to call the debtor or the borrower. *Id.* ¶ 65. Nationstar admitted that the individual collectors at Defendants' collection centers are fed calls one after the other with sometimes with absolutely no downtime. *Id.* ¶ 66. During her deposition Ms. Wimberly testified as to the type of telephone system Nationstar employs:

> Q. …In general when – when collection calls are being made, you're not deciding who to call in the outbound calls, the system is doing that for you, correct?
>
> A. Yes.
>
> Q. Okay. All right. So describe for me if you can a typical day. When you walk into the office to start your

day, you put your headset on and what happens?  Tell me.

 A.   I walk into the office.  I put my headset on.  I pull up the dialer and I go into, more than likely, outbound and it'll go ahead and start dialing the calls for me.

(BY MR. CHAMI)  Okay.  And so when the headset's on and you -- you open up, is it LSAMs, is that what it's called?

A.  Well, we have iAssist now, which is another.

Q.   Okay.  iAssist.  Put your headset on, you open up the computer program to go into outbound calls; is that accurate?

A.  Yes, and I put in my extension number to my phone.

Q.  Okay.  And then a call comes in?

A.  Yes.

Q.  All right.  And let me ask you, do you hear the phone ring when you're on the phone?

A.  No, it just pops up.

Ex. Q Wimberly Depo. 19:2-8, 20:4-21:1. The testimony of Ms. Wimberly clearly

illustrate that the Defendant does in fact use an automatic telephone dialing system.

Her testimony indicates that the telephone system is paired with iAssist, which

predicts the best time to dial a borrower. Additionally, her testimony makes clear, as

does the recording of the August 4, 2015 call, that there is no human intervention

needed and the system places the outbound calls for her without any knowledge of

who is being contacted. PSOF at ¶¶ 49, 62, 68-70. Considering the testimony made by Defendants' representatives, the Court should find that the Defendant used an ATDS and the calls were made automatically.

Notably, during the August 4, 2015 call, the representative states that he was unable to stop the calls since Nationstar uses an "automatic dialer." PSOF ¶ 49. After listening to the recording above, Ms. Wimberly confirmed that outbound calls are placed through an automatic dialer system. Ex. Q at 40:25-41:6. There is no doubt that Ms. Wimberly understood what an automatic dialer was because she stated in her deposition "[t]o my understanding is the generating system that dials out the numbers." *Id*. 39:14-17.

This Court should grant summary judgment for Plaintiffs' TCPA claim that Defendant negligently called Plaintiff's cell phone using an ATDS for the following reasons: the Defendants' representatives have admitted to understanding what an automatic dialer and have admitted to using an automatic dialer, Mr. Heard revoked consent to be contacted on at least **15** separate occasions, Nationstar admitted that the iAssist software predicts the best  time to call the borrower, Nationstar's dialer records indicate predictive calls, blast calls and pre-recorded messages were used when contacting the Plaintiff, the Defendants' representatives have admitted that there is no human intervention required to place outbound calls, Defendants' representatives admitted that the system determines who to call, Nationstar admitted

that the individual collectors are fed calls one after the other with little to no downtime.  *Id.* at ¶¶ 49, 62-63, 65-66, 68-70.

### (3) Defendant Willfully Violated The TCPA When Defendant Continued To Call Plaintiff With An ATDS After Plaintiff Revoked Consent.

This Honorable Court should grant Plaintiffs' motion for summary judgment for Defendant's "willful or knowing" violation of the TCPA when the Defendant continuously called Plaintiff Tommy Heard almost daily after he notified the Defendant to stop calling on multiple occasions.

A willful or knowing violation of the Telephone Consumer Protection Act occurs when the Defendant places calls to the party using an ATDS and after being notified that the party does not want to be call anymore. "In order for Plaintiff to prove that Defendants knew that they acted in a manner that violated the statute (regardless if Defendants actually knew that they were violating the statute), Plaintiff must also show that Defendants knew that Plaintiff did not consent to the phone calls." *Harris v. World Financial Network Nat. Bank*, 867 F.Supp.2d 888, 895 (E.D.Mich.,2012). "The TCPA does not require any intent for liability except when awarding treble damages." *Alea London Ltd. v. American Home Services, Inc.,* 638 F.3d 768, 776 (C.A.11 (Ga.),2011). "Importantly though, the intent for treble damages does not require any malicious or wanton conduct, but rather is satisfied by merely 'knowing' conduct." *Id.* at 776.

In *Harris*, the plaintiff answered a call on August 23, 2010 and told the defendant to stop calling him because the defendant was calling the wrong number. Despite plaintiff's revocation, the defendant continued to call the plaintiff using an Avaya Predictive Dialing system (the same type of ATDS the Defendant uses in this case). *Harris,* 867 F.Supp.2d at 890-91. The plaintiff produced the audio recording, filed a motion for summary judgment regarding liability, and was granted the motion by the court. *Id.* at 894.

The plaintiff also requested that he be awarded treble damages for defendant's "willful or knowing violation" of the TCPA. The court awarded the damages because it found that the defendant "displayed a reckless disregard for [p]laintiff's rights under the TCPA." *Id*. at 895-96. Moreover, the court stated that the ruling was "consistent with the FCC's determination that it is a creditor or debt collector's burden of proving consent to call a party's cellular phone." *Id.* at 896.

Here, Plaintiff Tommy Heard notified the Defendant to stop calling him on cell phone on August 22, 2015. PSOF ¶ 55. Additionally, Plaintiff continued to receive calls to his cell phone and he revoked consent to be called a total of not less than 15 times. *Id.* ¶ 58; *See Also,* Ex. G Nationstar at 001226, 001227, 001228, 001229, 001230, 001233, 001234, 001236, 001237.

### (4) Defendant's Use of Pre-Recorded Messages are Per Se Violations of the TCPA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

　　While Plaintiffs assert that summary judgment is appropriate for all autodialed calls made after August 22, 2015, it is undeniable that at a minimum Plaintiffs are entitled to summary judgment for all prerecorded messages ("Blast" calls) made by defendant after August 22, 2015.  The TCPA specifically states that it is unlawful to "[m]ake any call… using any automatic telephone dialing system or an artificial or **prerecorded voice**… to any telephone number assigned to a paging service, **cellular telephone service**… or any service for which the called party is charged for the call…" 47 U.S.C. § 227(b)(1)(A)(iii). (emphasis added).

　　Defendant's own call records show a multitude of "pre-recorded dialer message" notes attached to the phone call date and time. The pre-recorded/Blast calls were made to Plaintiff's phone on the following dates: August 22, 2015 3:00 p.m.; September 5, 2015 at 4:54 p.m.; September 11, 2015 at 11:48 a.m.; October 16, 2015 at 7:21 p.m.; November 6, 2015 at 5:37 p.m.; November 7, 2016 at 4:51 p.m.; November 28, 2015 at 3:15 p.m.; November 30, 2015 at 7:18 p.m.; December 4, 2015 at 4:35 p.m.; December 5, 2015 at 3:45 p.m.; and April 4, 2016 at 5:30 p.m. PSOF ¶ 61. Ex. G.  By the very definition of the TCPA, the prerecorded voice messages left on Plaintiff's cellular phone, that Plaintiff pays for, are violations of the statute. 47 U.S.C. § 227(b)(1)(A)(iii).

　　In summary, there is no genuine dispute of material fact regarding whether Defendant willfully or knowingly violated the TCPA, and Plaintiff respectfully

requests that this Honorable Court find that Defendant willfully violated the TCPA. The only remaining issue for a trier of fact would be to determine the appropriate amount of damages between $500.00 and $1,500.00 under the circumstances.

**B. NO GENUINE DISPUTE OF MATERIAL FACT REGARDING WHETHER DEFENDANT VIOLATED THE FCRA; DEFENDANT VIOLATED THE FCRA BY REPORTING INACCURATE INFORMATION AND NOT COMPLETETING A REASONABLE INVESTIGATION**

The Plaintiffs are entitled to summary judgment because the Defendant clearly violated the FCRA by not completing a reasonable investigation when the consumer disputed the inaccurate credit reporting information. The Defendant did not complete a reasonable investigation because (1) the dispute agents simply look at the payment history and compare it with the credit reporting agencies' (CRA) information, (2) the dispute agents average between 50-100 disputes a day, (3) the dispute agents did not reach out to the escrow department when handling the dispute sent in by the Plaintiffs, (4) the dispute agents were not properly trained, (5) the account was in fact never late, (6) and the Defendant is currently reporting a negative escrow after confirming with the Plaintiffs that it has been removed back in 2015.

Under the FCRA a furnisher "[a]fter receiving notice pursuant to § 1681i of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall (A) conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-

2(b)(1)(A). The reasonableness of the furnisher's investigation will in part depend on the status of the furnisher – "as an original creditor, a collection agency collecting on behalf of the original creditor, a debt buyer, or a down-the-line buyer – "and on the quality of documentation available to the furnisher." *Hinkle v. Midland Credit Management, Inc.*, 827 F.3d 1295, 1302 (C.A.11 (Ga.), 2016).

The issue before the Court concerns Defendant's attempts to collect an escrow balance on Plaintiffs' account that was subsequently reported to the credit reporting agencies that resulted from an improperly placed escrow account on the Plaintiffs' loan. PSOF ¶ 11. Plaintiff Tommy Heard spoke with multiple representatives of Nationstar to resolve the issue. *Id.* ¶¶ 15, 25, 34, 41, 44. He provided Nationstar's escrow department with proof of insurance to show that he was insured and an escrow should not have been placed, and he sent bank statements showing that he has made timely payments since Nationstar began to service the loan. *Id.* ¶¶ 21, 32. Further, Mr. Heard has paid an additional amount of $13.27 than is required by his mortgage payment each month. *Id.* at ¶ 7.

The *Hinkle* court delves into the requirements of a furnisher by first looking at the plain text of § 1681s-2(b). After analyzing the meaning of the statute, the *Hinkle* court concluded that the "definitions support the conclusion that § 1681s-2(b) requires some degree of careful inquiry by furnishers of information." *Id.* at 1303. "In particular, when a furnisher does not already possess evidence establishing that

an item of disputed information is true, § 1681s–2(b) requires the furnisher to seek out and obtain such evidence before reporting the information as 'verified.'" *Id.* at 1303.

The defendant in *Hinkle* was a "down-the-line" debt buyer; not unlike Defendant Nationstar who acquired servicing rights from Ocwen.  When the plaintiff in *Hinkle* disputed the information with the defendant, the defendant simply compared the information possessed by the credit reporting agencies (CRAs) with the information in its internal records. The court held that the defendant was not entitled to summary judgment based off the facts of the case and it had a duty to conduct a more thorough investigation. *Id.*

Similarly, Defendant Nationstar was not the original creditor. PSOF ¶ 8. Plaintiff Tommy Heard obtained his credit report in or around October 2015 and confirmed that Nationstar had reported him as delinquent in different months with the various credit reporting agencies. *Id.* ¶ 72. Mr. Heard sent a letter disputing the inaccurate information with the various credit reporting agencies, who in turn notified Nationstar of the consumer dispute. *Id.* ¶ 75.  In at least one conversation with Nationstar Mr. Heard was assured that his credit report would be corrected to fix any negative reporting.  *Id.* at ¶¶ 53, 54.  Nationstar did not complete a reasonable investigation as required by § 1681s-2(b). Defendant Nationstar did not "seek out and obtain such evidence before reporting the information as verified" as required

by § 1681s-2(b). The Defendant did not have any communications with Ocwen and considering the debt it was collecting was purportedly assessed by Ocwen, it is shocking that Nationstar did not make any effort to communicate with Ocwen once the dispute was raised (at the very latest).  PSOF ¶¶ 108, 109. Additionally, the Defendant, like the defendant in *Hinkle*, compared the information possessed by the CRAs and the information on its internal computers only.

> Q. Would it be fair to say that when reviewing -- when receiving an ACDV that your practice is to look at the information on the ACDV and compare it to what's on the LSAMS computer screen to make sure that it's reporting accurately?
>
> A.     Yes.
>
> Q.     And the changes that you would make would be the changes that are indicated in LSAMS, right?
>
> A.     Yes, I would reflect that.

Ex. R Kasza Depo. 37:8, 38:23.

> Q. So tell me, is there a normal process that you follow when you review a dispute from a consumer?
>
> A.     Yes.
>
> Q.     Describe that process to me.
>
> A.     Okay.  I look at LSAMS and see -- Oh, first of course, I pull up the e-OSCAR dispute.  And then I pull LSAMS and then I always review the borrower information first.  And then if I need to, I check the note. And then I just follow the rest of the ACDV to see what the borrower disputed and the borrower sometimes they

> include a dispute like specifically what they're disputing.
> Sometimes they don't.  So a lot of times we just have to
> go through the ACDV, look at every single thing and
> look at LSAMS, verify what we have and what came
> through.

Ex. S Gifford Depo. 18:5-18. It is clear from the above two excerpts that the dispute

agents simply reviewed the information possessed by the credit reporting agencies

and the information contained in the internal records at Nationstar. After checking

for any inconsistencies between the CRAs' information and Nationstar's, the dispute

agents then change the CRA's information to match the information of Nationstar's

records. This is a bare-bones attempt to make changes that are based not on an

investigation but only on confirming the information in the system. Ms. Gifford

further testified:

> Q.    Well, in order for you to make these entries, you
> would have had to look at something, correct?
>
> A.    Yes.
>
> Q.    What would you have looked at?
>
> A.    The payment history in LSAMS.
>
> Q.    And LSAMS is just a computer screen, right?
>
> A.    Yes.
>
> Q.    So you look at the payment history computer screen
> and you put into the ACDV response whatever the
> computer screen says, correct?
>
> A.    Correct.

*Id.* at 31:2-12. Again, the Defendants' representatives testify that all they do is compare the reported history to what is currently showing on their computer screen. There is no reasonable investigation that comprises of reviewing the documents supplied by Plaintiffs or communicating with the prior mortgage servicer or trying to locate evidence to support the reporting. The Plaintiffs' dispute revolved around incorrect escrow being placed on their account and the dispute agents did not even take steps to reach out to the escrow department or take any steps related to the specific claim the Plaintiffs were making.

> Q. I mean in your process of looking at a dispute, are you able to make a decision about whether or not Nationstar is improperly trying to collect for escrow payments like Mr. Heard is alleging in his dispute?
>
> A.    I do not work escrow, no.
>
> Q.    So I understand that you don't work in escrow.  So my question was a little different though.  It was more or less trying to ascertain whether you would need to reach out to escrow as part of your investigation to figure out if what Mr. Heard was claiming had any merit, would that be something that you would normally do is reach out to escrow in a situation where the borrower is claiming that the issue is with improper escrow?
>
> A.    No.
>
> Q.    So how would you investigate a claim like this by Mr. Heard to determine whether the lates that are being reported are related to an escrow issue?

A.     If I had seen this letter, I would have just gone through the payment history.

Q.     Okay.  So you would have looked at LSAMS and you would have -- which is likely what you did here, right?

A.     Yes.
Q.     And just reported the lates as they showed in the computer, right?

A.     Correct.

*Id.* at 38:18-25, 39:1-18. As illustrated by the testimony above, Ms. Gifford admitted that reaching out to the escrow department would not be something that she would normally do. The only actions she would take to investigate the claim and determine whether the information is accurate is look to the computer screen and compare it with the information provided by the CRAs. Parroting what the computer shows is not a reasonable investigation. Nationstar agrees that even if something is reporting accurately on the Nationstar computer and to the credit reporting agencies, it can still be inaccurate. SOF ¶ 86. Ultimately, when called to the mat over whether the reporting was accurate, Nationstar was forced to correct it.

Q: Yeah, why did Ocwen force place insurance on the property?
A: No, well, I misspoke.  I don't know why Ocwen force placed the insurance that they placed.  I just know that   when I discovered, I fixed it.
PSOF ¶ 85 Ex. O 28:2-6.

When questioned further about the credit reporting at issues Ms. Clopton initially indicated that Nationstar attempted to communicate with Ocwen about the Escrow only to admit she had no evidence of any such contact.

> A: Well, I'm not speaking for Ocwen and I –
>
> Q: Nationstar?
>
> A: -- want to make that clear.  I'm here on behalf of Nationstar.  I'm not in-house Counsel, so I can't provide you with any legal conclusions.  What I will say is my understanding of this file on behalf of Nationstar is escrow was placed by Ocwen prior to the transfer.  Ocwen didn't correct it when it transferred.  When it transferred to us, it was impounded with escrow. And when we requested that Ocwen clarify that or make corrections, which will also be them approving for us to remove the negative and send that back to them, they confirmed that their financial that were sent over including the escrow was correct.
>
> Q: Where is that confirmation? Is it in writing?
>
> A: It won't be part of this record because that is handled by acquisitions.
>
> Q: Okay. So I want to see – have you seen request from Nationstar to Ocwen requesting that they confirm the escrow shortage was proper?
>
> A: I've seen the research request.  I haven't seen any documentation where this person sent something – Nationstar sent this to Ocwen and they sent the response, I haven't seen that.

*Id.* at 139:12-140:10.

After Ms. Clopton testified about these alleged communications that she was not a party to, Nationstar entered into a stipulation confirming that apart from the documents and information contained in the documents disclosed to Plaintiff in the litigation, Ocwen had no other communications with Ocwen concerning Plaintiff's escrow account.  PSOF ¶ 109.

## V.    CONCLUSION

Plaintiff respectfully further requests that this Honorable Court grant Plaintiff's motion for summary judgment as to liability for Defendant's willful violations of the TCPA and award statutory damages of $271,000.00 in addition to reasonable attorney's fees pursuant to 47 U.S.C. § 227(b)(3)(B), § 227(b)(3)(C), 15 U.S.C. § 1681n, and § 1681s-2(b) and award statutory damages of $270,00.00 and enter judgment against Defendant Nationstar for violating the TCPA and FCRA.


Respectfully submitted this 3rd day of July, 2017

/s/ David A. Chami                          /s/Joshua C. Snable
David A. Chami (pro hac vice)        OF COUNSEL:
PRICE LAW GROUP, APC             SNABLE LAW FIRM, LLC
1204 E. Baseline Road, Suite 102    2112 11th Avenue South, Suite 528
Tempe, Arizona 85283                   Birmingham, AL 32505
david@pricelawgroup.com             jsnable@snablelaw.com

                                                   Attorneys for Plaintiffs
                                                   *Tommy & Katrina Heard*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of July 2017, a true and exact copy of the foregoing has been served via U.S. Mail and Electronic Mail upon the following counsel of record:

Of Counsel:
R. Frank Springfield (SPR024)
Ryan J. Hebson (HEB003)
BURR & FORMAN LLP
420North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205)251-3000
fspringf@burr.com
rhebson@burr.com

Robert M. Luck, III (admitted pro hac vice)
REED SMITH LLP
901 East Byrd Street Suite 1700
Richmond, Virginia 23219
Telephone: (804) 344-3416
rluck@reedsmith.com

Henry Pietrkowski (admitted pro hac vice)
REED SMITH LLP
10 South Wacker Drive 40th Floor
Chicago, Illinois 60606-7507
Telephone: (312) 207-3904
hpietrkowski@reedsmith.com

Attorneys for Defendant
Nationstar Mortgage, LLC


/s/Sandra Padilla