# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **TOMMY & KATRINA HEARD,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | |
| | } | |
| **NATIONSTAR MORTGAGE LLC,** | } | **Case No.:  2:16-cv-00694-MHH** |
| | } | |
| **Defendant.** | } | |
| | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case arises from defendant Nationstar Mortgage, LLC's efforts to collect purportedly overdue mortgage payments from plaintiffs Tommy and Katrina Heard and Nationstar's inaccurate reporting of the plaintiffs' payment delinquencies to credit bureaus.  The Heards contend that Nationstar improperly billed them for force-placed property insurance which caused Nationstar to escrow their mortgage account.  When the Heards made their mortgage payments without the added escrow charge, Nationstar began reporting the unpaid difference as delinquent.  The Heards argue that by reporting unverified delinquencies, Nationstar violated their rights under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*  Mr. Heard also contends that to collect the escrow charges Nationstar

subjected him to repeated, autodialed collection calls in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*

The Heards ask the Court to enter judgment in their favor on their FCRA and TCPA claims, leaving the issue of damages for trial. (Doc. 47, p. 6). Nationstar opposes the Heards' motion. (Doc. 51). For the reasons stated below, the Court grants the plaintiffs' motion and sets the issue of damages for trial.

## I. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). When considering the Heards' summary judgment motion, the Court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party, Nationstar. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "The court need consider

only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II. FACTS

The parties' dispute arises from a mortgage that the Heards obtained in 2001 for an investment property in Jacksonville, Alabama. (Doc. 48-2, p. 2). The Heards refinanced the mortgage in 2005 through GMAC Mortgage, LLC. (Doc. 52, p. 30). Mr. Heard provided his cell phone number to GMAC as part of his loan refinance application. (Doc. 48-1, pp. 35–36). GMAC transferred the mortgage to Ocwen Loan Servicing, LLC, and Ocwen transferred the mortgage to Nationstar in April 2015. (Doc. 48-2, p. 2; Doc. 48-15, p. 20). The facts surrounding Ocwen's servicing of the mortgage are somewhat murky, but it appears that just before transferring the mortgage, Ocwen provided insurance for the Heards' property (force-placed insurance) under the mistaken belief that the Heards had not insured their property. (Doc. 48-15, pp. 31, 172–73). Ocwen would have charged the Heards for the cost of this insurance, and as a result, the Heards' mortgage account had a negative escrow balance, which was reflected in their account information when Ocwen transferred the mortgage to Nationstar. (Doc. 48-15, p. 12).

Based on the loan information from Ocwen, Nationstar added charges to the Heards' monthly mortgage payments to account for the negative escrow balance.

(Doc. 52, pp. 31–32). Mr. Heard was unaware of the escrow charges and set up monthly automatic payments in the amount he had historically paid on the loan. (Doc. 48-2, p. 3). Because this payment amount was less than the amount Nationstar billed to the Heards' account, Nationstar began to record the shortfall as late. (Doc. 48-7, pp. 13–14; Doc. 48-18, pp. 26–27).

Nationstar made a collection call to Mr. Heard's cellular phone on June 4, 2015. (Doc. 48-7, p. 3). During this call, Mr. Heard learned that his monthly payments had increased to reflect the addition of force-placed insurance which resulted in an escrow balance on the account. (Doc. 48-2, p. 3). Mr. Heard disputed the need for force-placed insurance and informed the representative that he had maintained insurance on the property for several years. (Doc. 48-2, p. 3). Mr. Heard had his insurer fax proof of his property insurance to Nationstar on June 5, 2015. (Doc. 48-7, pp. 4–5; Doc. 48-15, pp. 26–27).

Although Mr. Heard provided Nationstar with information indicating that the force-placed insurance was unnecessary, Nationstar continued to bill Mr. Heard for the escrow balance created by the force-placed insurance, and Nationstar's representatives continued to make collection calls to Mr. Heard's cell phone. (Doc. 48-7, pp. 13–14; Doc. 48-15, p. 14). During several of these calls, Mr. Heard contested the amount of his mortgage payment, and the Nationstar collections representative often would transfer his call to Nationstar's escrow

department to correct the ongoing discrepancy. (Doc. 48-7, pp. 12–14). The record of a call on July 24, 2015 indicates that Nationstar removed the escrow from the Heards' account and planned to adjust the monthly payment to reflect the change. (Doc. 48-7, p. 9). Despite this, the Heards' monthly statements continued to reflect their mortgage payment plus an additional escrow charge.

The ongoing discrepancy between the Heards' monthly payments and their monthly statement caused a steady stream of collection calls to Mr. Heard's cell phone. (Doc. 48-7, pp. 15–34). Nationstar often would call Mr. Heard many times a day. (Doc. 48-7, pp. 21–22; Doc. 48-14, pp. 9–10). Mr. Heard states that on August 22, 2015, he told Nationstar to stop calling him on his cellular phone. (Doc. 48-2, p. 5). Nationstar's call records indicate that on October 29, 2015, Mr. Heard first told Nationstar to stop calling him. (48-7, p. 19). Nationstar's call records also indicate that Mr. Heard told Nationstar collections representatives to stop calling him on ten subsequent occasions. (Doc. 48-7, pp. 20–23, 26–27, 29–30, 32).

Nationstar reported the Heards' mortgage account as thirty days delinquent for several months during 2015. (Doc. 48–18, pp. 27–28). In response to these negative entries, the Heards individually sent credit disputes to Transunion, Equifax, and Experian stating that the payment histories reported by Nationstar were inaccurate due to the incorrect forced placement of insurance on the property

and the resulting escrow on the mortgage. (Doc. 48-23; Doc. 48-29). When Nationstar received notice of these disputes, Nationstar checked the information in the Heards' credit reports against Nationstar's records of the couple's payment history and reported that the Heards' account was delinquent. (Doc. 48-18, pp. 27–28; Doc. 48-19, pp. 32–33, 35; Doc. 48-20, p. 23). In fact, it was not. The Heards claim that in addition to the time and effort they spent attempting to correct the inaccuracies, Nationstar's incorrect reporting of their mortgage account caused them to be denied credit from their normal lenders and to pay higher rates with other institutions. (Doc. 47, p. 5). Nationstar has since revised its reporting of the mortgage loan and acknowledges that the account is current with no delinquencies. (Doc. 28-15, pp. 14, 15).

## III. DISCUSSION

### A. MR. HEARD'S TCPA CLAIM

"The TCPA was enacted to address certain invasive practices related to 'unrestricted telemarketing,' and is designed to protect consumers from receiving unwanted and intrusive telephone calls." *Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1276 (11th Cir. 2017) (citing *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012)). The TCPA makes it unlawful to use "any automatic telephone dialing system or an artificial or prerecorded voice" to call "any telephone number assigned to a . . . cellular telephone service," without the express consent of the

party being called. 47 U.S.C. § 227(b)(1). Congress provided a private right of action for those who receive calls made in violation of the TCPA's prohibitions. 47 U.S.C. § 227(b)(3).

"The TCPA is essentially a strict liability statute" that "does not require any intent for liability except when awarding treble damages." *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011). Because Nationstar called a number assigned to a cellular phone service, (Doc. 48-1, pp. 47–48), the question is whether Nationstar called Mr. Heard with his consent and whether Nationstar called him using an automatic dialer.

### 1. Mr. Heard's Consent to Receive Calls

"[A]utodialed ... calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party." *In re Rules & Reg. Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 559 (2008). Mr. Heard provided his cell phone number to GMAC in connection with his initial application to refinance his mortgage. (Doc. 48-1, p. 34–35). The transfer of the mortgage to Nationstar effectively gave Nationstar permission to contact Mr. Heard in connection with his existing mortgage debt at the number he provided to GMAC. Additionally, during several early calls from Nationstar, Mr.

Heard expressly authorized Nationstar to call his cell phone. (*See, e.g.*, Doc. 48-7, pp. 4, 7, 11).

As the collection calls continued, Mr. Heard withdrew his consent and repeatedly told Nationstar collections representatives that he wanted them to stop calling his cell phone. (*See, e.g.*, Doc. 48-7, pp. 19–22, 24, 26–27, 29–30, 32). Nationstar argues that Mr. Heard could not unilaterally revoke his prior consent and that his oral revocations were ineffective. (Doc. 51, p. 18). The Court does not agree.

In *Osorio v. State Farm Bank*, the Eleventh Circuit held that where the creditor initially had obtained the debtor's phone number, the debtor could orally revoke his prior consent to receive calls at that number. 746 F.3d 1242 (11th Cir. 2014). The *Osorio* court reasoned that, absent statutory language to the contrary, courts presume that Congress intended the common law meaning of a long-used term like "consent," *id.* at 1252–53, and "[c]ommon-law notions of consent generally allow oral revocation." *Id.* at 1255. The Eleventh Circuit has since affirmed the proposition that oral revocation of consent is effective for purposes of the TCPA. *See Schweitzer*, 866 F.3d at 1274. In addition, the D.C. Circuit, in a recent opinion addressing a 2015 FCC ruling, affirmed the validity of the Commission's similar approach to consent. *ACA Int'l v. FCC*, 885 F.3d 687, 709–10 (D.C. Cir. 2018). While parties may contract to limit the means of revoking

consent, Nationstar has not cited a contractual provision limiting Mr. Heard's common law right to orally revoke his consent to be called, so nothing prohibited Mr. Heard's unilateral revocation of consent.

Mr. Heard states that he first revoked consent on August 22, 2015. (Doc. 48-2, p. 5). Nationstar does not identify a particular date, but it does note that a collections representative did not actually speak with Mr. Heard on August 22, 2015. (Doc. 52, p. 11). The first call entry in which a Nationstar representative noted that Mr. Heard asked not to be called appears on October 29, 2015. (Doc. 48-7, p. 19). Before then, another representative noted that Mr. Heard said that he had retained legal counsel. (Doc. 48-7, p. 18). The parties dispute whether this was the point at which Nationstar should have stopped calling Mr. Heard, but resolution of this factual question affects only the amount of damages that Mr. Heard may recover if Nationstar made the calls using an automatic dialer. Therefore, it is a question appropriate for trial.

### 2. Whether Nationstar Used an Automatic Dialer

The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity **(A)** to store or produce telephone numbers to be called, using a random or sequential number generator; and **(B)** to dial such numbers." 42 U.S.C. § 227(a). The Heards emphasize the fact that Nationstar's system dials

collection calls without the direct involvement of a collections representative. (Doc. 47, p. 15). Nationstar contends that the Heards have not provided evidence showing that Nationstar's system has "the capacity to store or produce telephone numbers to be called, using a random or sequential number generator." (Doc. 51, pp. 3–4).

The evidence concerning the features of Nationstar's calling system is largely undisputed.[1] But the parties dispute whether those features fall within the TCPA's definition of an automatic dialer. Because the parties are largely in agreement on the relevant facts, the TCPA's application to those facts is a legal question for the Court to resolve.

To contact borrowers, Nationstar uses the Avaya Proactive Contact system in conjunction with software known as iAssist. (Doc. 48-15, pp. 109–10; Doc. 52-4, p. 2). The Heards contend that Nationstar used this system to make two types of calls falling within the TCPA's prohibition: "blast" calls and predictive calls. (Doc. 48, p. 5). Regarding the first category, a representative for Nationstar testified that these blasts are calls "made by the system" in which Nationstar sends

---

[1] The parties offer competing testimony to support their arguments. Mr. Heard relies on a recorded call in which a Nationstar collections representative states that he needs to confirm Mr. Heard's cell phone number because the representative is using an automatic dialer. (Doc. 48-15, pp. 53, 55). The defendants rely on the declaration of Richard Volel, a vice president of Nationstar's call center operations. Mr. Volel states that Nationstar did not use an automatic dialer to make collection calls. (Doc. 52-4, p. 2). Neither individual offers descriptive facts regarding Nationstar's call operations inconsistent with the facts recited below. Therefore, the contradictory, conclusory testimony of these non-experts does not control the Court's inquiry.

the customer "prerecorded messages." (Doc. 48-16, pp. 35–37). As the Heards note, these calls are prohibited by the TCPA's plain language. *See* 47 U.S.C. § 227(b)(1)(B). The record indicates that Nationstar placed eleven prerecorded blast calls to Mr. Heard's cell phone. (Doc. 48-14, pp. 3–5, 7, 9, 11, 18). Although the disputed factual issue of when Mr. Heard withdrew consent precludes the Court from tallying in this opinion the number of calls for which Nationstar is liable, there is no genuine dispute that once Mr. Heard withdrew his consent, Nationstar's blast calls violated the TCPA.

The analysis of predictive calls is more complex. Nationstar's iAssist program applies algorithms to customer information to predict when a customer is most likely to answer the phone. (Doc. 48-16, pp. 31–32). iAssist then dials numbers for collections representatives based on these predictions. (Doc. 48-17, pp. 18–19, 21). If iAssist detects a voice response, then the system connects the call to a representative. (Doc. 48-16, p. 54). Each day, Nationstar employees input the necessary call data from the company's loan files into iAssist. (Doc. 48-16, pp. 37–38). A collections representative must log into iAssist by entering his or her personal extension before the software can begin forwarding calls to the representative. (Doc. 48-15, p. 118; Doc. 48-17, p. 21).

Since 2003, the FCC has regarded predictive dialers like the one used by Nationstar as automatic dialers within the meaning of the TCPA. *In the Matter of*

*Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC

Rcd. 14014, 14091–93 (July 3, 2003).  In 2015, the FCC reaffirmed its position in

its most recent ruling on the definition of autodialers.  *In re Rules and Regulations*

*Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961,

7991–93 (2015).  Recently, the Court of Appeals for the District of Columbia

Circuit determined that "the Commission's ruling, in describing the functions a

device must perform to qualify as an autodialer, fail[ed] to satisfy the requirement

of reasoned decisionmaking."  *ACA Int'l*, 885 F.3d at 703.  Accordingly, the D.C.

Circuit set aside that portion of the FCC's 2015 rule.  *Id.*[2]

In the absence of agency guidance, courts must interpret and apply statutory

provisions in accordance with the definitions Congress has given to statutory terms

contained therein.  *See Stansell v. Revolutionary Armed Forces of Colombia*, 704

F.3d 910, 915 (11th Cir. 2013).  Nationstar argues that its system is not an

automatic dialer because it does not "store" caller information.  That information,

Nationstar argues, is located on a separate "host system."  (Doc. 51, p. 6).  But

Nationstar's own representatives indicate that the information necessary for

---

[2] The D.C. Circuit released its decision in *ACA International* after the parties to this case had fully briefed the Heards' motion for summary judgment.  Nationstar since has moved for leave to file supplemental briefing addressing the effect of D.C. Circuit's decision on the issues in this case.  (Doc. 65).  In a series of supplemental authority filings, Nationstar argued that the *ACA International* decision set aside not only the FCC's 2015 ruling but also the FCC's 2003 and 2008 rulings on which the 2015 ruling was based.  The Court has read and considered the decision in *ACA International*.  Because the Court does not rely on the FCC's guidance in it analysis below, the Court denies Nationstar's motion for supplemental briefing as moot.

predictive calling is uploaded onto the Avaya/iAssist system daily. (Doc. 48-16, p. 38). The uploaded information is stored on Nationstar's dialing system until it is removed. This conclusion is supported by the fact that Mr. Heard received several calls in the course of one day. Thus, his caller information was stored in Nationstar's dialer throughout that day. (*See, e.g.*, Doc. 48-7, pp. 21–23).

Nationstar does not explain why the period in which the information is kept on its dialing system is too short to qualify under the TCPA as "store[d] [] telephone numbers to be called." 42 U.S.C. § 227(a). Nationstar has not pointed to evidence contradicting the Heards' showing that caller information remains in the dialing system for some period of time. The TCPA does not require that the automatic dialer be the primary or permanent storage location for caller information. *See Lardner v. Diversified Consultants, Inc.*, 17 F. Supp. 3d 1215, 1221 (S.D. Fla. 2014) ("The statute has no requirement on how long a telephone number is stored. If the equipment "has the capacity to store or produce telephone numbers," then it meets the statutory definition of an ATDS."). The fact that Nationstar stores the data elsewhere for longer periods of time is irrelevant.

The evidence shows that Nationstar's dialer system could and did store customer information for at least 24 hours. Nothing in the TCPA indicates that Congress intended a narrow definition of the storage concept that would limit the statute's application to technology that stores telephone numbers for an extended

13

period of time. Rather, because the TCPA is "a consumer protection statute which is remedial in nature," this Court must interpret the statute broadly. *Carmichael v. Nissan Motor Acceptance Corp.*, 291 F.3d 1278, 1280 (11th Cir. 2002) (Noting that remedial statutes "must be construed liberally in order to best serve Congress' intent.") (internal quotation marks omitted). Therefore, Nationstar's system had the capacity to "store" caller information within the meaning of the TCPA.

Next, to avoid Mr. Heard's TCPA claim, Nationstar seizes on the statutory requirement that an automatic dialer have "the capacity to store or produce telephone numbers to be called, **using a random or sequential number generator**." (Doc 51, p. 9) (emphasis in Nationstar's brief). As the D.C. Circuit noted in *ACA International*, this phrase "has generated substantial questions over the years." 885 F.3d at 701.[3] The phrase bolded above applies neatly in the context of telemarketing where the targets of automated calls are groups of individuals rather than specifically identified individuals. The application may be less clear in the collections context. An entity attempting to collect a debt will not

---

[3] In setting aside the FCC's ruling, the D.C. Circuit noted that the commission seemed to be of two minds on the phrase's meaning. *ACA Int'l*, 885 F.3d at 701. The FCC's ruling suggested that there was a legally significant difference between devices that generate the numbers to be called and devices that call numbers from a set list. *Id.* at 701–02. But the FCC also indicated that it considered both such devices to have the characteristics of automatic dialers. *Id.* at 702–3. The Commission's seemingly inconsistent approach to the subject doomed the 2015 ruling, but the D.C. Circuit noted that under the TCPA, the Commission could adopt the broader interpretation of automatic dialers, encompassing devices that called numbers from an external list. *Id.* at 703.

generate phone numbers randomly or sequentially without regard to whether the person being called owes the company money. In that regard, an entity like Nationstar will always make its collection calls with reference to a relatively narrow, predetermined list of telephone numbers. But this fact does not prevent the TCPA from applying to Nationstar's predictive collection calls.[4] Again, Nationstar's proposed interpretation of the TCPA is too restrictive.

As discussed, Nationstar's system produces from the inputted call data a list of numbers that the iAssist software sequences according to a borrower's predicted availability to receive calls. iAssist then dials the numbers as sequenced and connects the call to a Nationstar representative only if someone answers the call that iAssist initiated. Yes, Nationstar's system is limited by the daily informational inputs of Nationstar employees, but the system orders sequentially the many numbers to call by analyzing customer information and assigning times for Nationstar to contact particular numbers. (Doc. 48-16, pp. 31–32, 38; Doc. 48-17, p. 18); 42 U.S.C. § 227(a)(1)(B).

Although a collections representative must log in before the system begins dialing, that does not detract from the fact that the representative does not choose

---

[4] Although the TCPA includes an established business relationship exception that exempts certain debt collection calls, the TCPA does not make an exception for auto-dialed collection calls made to a cellular phone. *See Clark v. Allied Interstate, LLC*, 2017 WL 2903358, at *3 (N.D. Ga. Jan. 20, 2017).

whom to call or dial the outgoing calls. *Cf. Strauss v. CBE Grp., Inc.*, 173 F. Supp. 3d 1302, 1310–11 (S.D. Fla. 2016) (holding that a system in which a representative used a manual clicker to initiate each call was not an automatic dialer because "human intervention [was] essential at the point and time that the number is dialed"). Additionally, the fact that Nationstar employees "scrub" and input loan data for the system's use does not obviate the role that Nationstar's iAssist software plays in selecting the numbers to call and initiating each call. (Doc. 48-16, p. 38). To hold that a system is not an automatic dialer whenever an employee examines and transfers information from an external database onto the dialing system would unnecessarily limit the TCPA's application. Although the language Congress enacted in the TCPA may not anticipate and expressly address each new innovation in the telecommunications field, defendants should not be able to circumvent the TCPA's prohibitions simply by disaggregating the functions of an automatic dialer into nominally separate, but functionally complimentary systems. Again, the TCPA is a remedial statute, and the Court may not harness its remedial power by applying the statute narrowly.

Based on the facts in the record, the Court concludes that Nationstar's system satisfies the TCPA's definition of an automatic dialer. Therefore, when Mr. Heard withdrew his consent to be contacted on his cell phone, Nationstar's predictive calls violated the TCPA. Mr. Heard is entitled to summary judgment on

his TCPA claims for Nationstar's blast and predictive calls following the date on which Mr. Heard withdrew his consent.

## B. THE HEARDS' FCRA CLAIM

Both Mr. and Ms. Heard assert claims against Nationstar under FCRA because Nationstar continued to report the couple as delinquent in their mortgage payments after the couple sent letters disputing their credit reports, and the credit reporting agencies provided Nationstar with notice of these disputes.

When a consumer gives notice to a credit reporting agency of a disputed credit report entry, the agency must conduct a reasonable investigation into the consumer's dispute. 15 U.S.C. § 1681i(a)(1). As part of this investigation, the agency must reach out to the person or entity that furnished the disputed information and provide the furnisher with "all relevant information regarding the dispute that is received by the agency from the consumer." 15 U.S.C. § 1681i(a)(2). The furnisher must review the information provided by the consumer and "conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s–2(b)(1)(A) & (B). The furnisher then must report the outcome of its investigation to the enquiring credit agency. 15 U.S.C. § 1681s–2(b)(1)(C). Failure to fulfill these obligations can render a furnisher, such as Nationstar, civilly liable to the affected consumer. 15 U.S.C. § 1681o.

"Reasonableness" is the touchstone for assessing the adequacy of a furnisher's investigation upon receiving notice of a dispute from a credit reporting agency. *Hinkle v. Midland Credit Mgmt.*, 827 F.3d 1295, 1302 (11th Cir. 2016). Whether a furnisher's investigation was reasonable is determined by reference to the circumstances of the case, including whether the furnisher is an original creditor, a collection agency, or a down-the-line debt buyer. *Hinkle*, 827 F.3d at 1303. When the furnisher possesses account level documentation, "such as applications, agreements, billing statements, promissory notes, notices, correspondence, payment checks, payment histories, or other evidence of indebtedness," the furnisher can more accurately assess a credit dispute with greater ease than could a furnisher with little account-specific documentation. *Hinkle*, 827 F.3d at 1298, 1303. Section 1681s–2(b) requires all furnishers to conduct a careful inquiry into disputed credit information which requires the furnisher either to rely on personal knowledge or to acquire documentary evidence that is sufficient to prove that the disputed information is true before reporting the information as verified. *Hinkle*, 827 F.3d at 1303. If a reasonable investigation neither confirms nor disproves the information, then the furnisher may report that the disputed information is unverifiable. *Hinkle*, 827 F.3d at 1303.

Nationstar's representatives responded to the dispute notices from Experian, Transunion, and Equifax by checking the information in the Heards' credit report

against Nationstar's records of the Heards' payment history. (Doc. 48-18, pp. 27–28; Doc. 48-19, pp. 32–33; Doc. 48-20, p. 21). One representative may have looked at the original note on the underlying mortgage, but the representatives otherwise did not seek documentary support for the reported information beyond the billing and payment information in Nationstar's system. (Doc. 48-18, pp. 34–34; Doc. 48-19, pp. 39–40; Doc. 48-20, pp. 24–25). One representative indicated that the type of dispute raised by the Heards is not the type of dispute she would have addressed even if she read the specifics in the couple's dispute letters. (Doc. 48-20, p. 21).

Here, Nationstar's reporting of the Heards' mortgage contained "a *factual* deficiency or error that could have been remedied by uncovering additional facts that provide a more accurate representation about a particular entry." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991) (emphasis in original). Nationstar had account-level documentation for the Heards' mortgage, and thus a reasonable inquiry would be more involved for Nationstar than for a furnisher without these records. *See Hinkle*, 827 F.3d at 1302-1303, 1306. Mr. Heard repeatedly contacted Nationstar about the escrow error and provided Nationstar with information — proof of property insurance — that would have corrected the error. (Doc. 48-7, pp. 4–5, 7–15). Nationstar acknowledged receiving this information. (Doc. 48-7, p. 5; Doc. 48-15, pp. 26–27).

In their letters to the credit reporting agencies, the Heards explained that their dispute specifically concerned the improper escrowing of their mortgage account for property insurance that they did not need. (Doc. 48-23; Doc. 48-29). The credit agencies were legally obligated to forward this information along with their automated dispute forms, 15 U.S.C. § 1681i(a)(2), and the evidence indicates that the Heards' disputes were transmitted to Nationstar with additional information concerning the particular error that the Heards sought to correct. (Doc. 48-18, pp. 21–22; Doc. 48-19, 17–18, 28).[5]

_____

[5] Nationstar contends that although the Heards' credit dispute notices were sent with images attached, there is no evidence that these images were viewable. (Doc. 51, p. 27). Two of the Nationstar representatives, whom the plaintiffs deposed, noted that images transmitted with dispute forms are often unreadable especially if they are handwritten. (Doc. 48-18, p. 22; Doc. 48-19, pp. 37–38). The Heards' letters were not handwritten. (Doc. 48-23; Doc. 48-29). Nationstar's representatives do not recall dealing with the Heards' dispute or viewing the images sent along with the Heards' credit dispute forms. (Doc. 48-18, pp. 20–21; Doc. 48-19, pp. 25, 28, 38).

As noted above, there is evidence that the Heards submitted dispute letters to the credit reporting agencies and that the agencies sent these letters to Nationstar. Nationstar has not produced evidence that the files accompanying the credit disputes were unreadable, and as such Nationstar has, at best, created only a metaphysical doubt about whether the company's representatives knew or should have known the specifics of the Heards' dispute. The non-movant must do more than this to create a genuine dispute of material fact. *See In re Delco Oil, Inc.*, 599 F.3d 1255, 1262 (11th Cir. 2010) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Additionally, given that Congress enacted FCRA to ensure that those involved in reporting consumer credit discharge their "grave responsibility" to the consumer and the financial system with care, 15 U.S.C. § 1681(a)(4), the Court declines to hold that a furnisher of credit information may avoid its obligation to reasonably investigate a credit dispute by relying on technology that frequently fails to read or transmit a debtor's description of the dispute.

Nationstar argues that the notices sent to them by the agencies were vague and indicated only that the Heards generally disputed the reporting of their payment history. (Doc. 51, p. 6). In light of this, Nationstar claims that it was reasonable for its personnel to simply check the Heards' payment history and perhaps the original note. (Doc. 51, pp. 25–27). But a furnisher may not "truncate its investigation simply because the [credit reporting agency] failed to exhaustively describe the dispute in its § 1681i(a)(2) notice." *Hinkle*, 827 F.3d at 1306 (citing *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 n. 11 (9th Cir. 2009)). Even if the credit agencies gave a less than detailed description of the Heards' dispute, this did not relieve Nationstar of its responsibility to review documents in its possession. *Id.*

Under the circumstances, it was not reasonable for Nationstar to simply cross-reference the Heards' payment history with the information in the Heards' credit report when the credit dispute concerned a more specific factual issue that Mr. Heard had raised many times with Nationstar. The evidence in the record indicates that Nationstar did not investigate the dispute further before verifying the Heards' credit information to the reporting agencies. Therefore, the Court enters judgment in Mr. and Ms. Heard's favor on their FCRA claims. The Court leaves the issue of damages for trial.

## IV. CONCLUSION

For the reasons stated above, the Court enters judgment in favor of Mr. and Ms. Heard on their FCRA claims. The Court also enters judgment in favor of Mr. Heard on his TCPA claim. The Court will set the issue of damages for trial by separate order.[6]

**DONE** and **ORDERED** this August 22, 2018.

_____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[6] A trial is the appropriate forum for addressing certain of the parties' arguments relating to damages including: when Mr. Heard withdrew his consent, whether the class action settlement in *Wright v. Nationstar Mortgage, LLC* precludes Mr. Heard from seeking damages for certain calls, and whether Nationstar's violation of the TCPA was willful.